## SAN ANGELO COUNTRY CLUB, Inc., v. STATE.

### No. 9708.

Court of Civil Appeals of Texas. Austin.

April 7, 1948.

Rehearing Denied April 28, 1948.

J. P. Hill, Scott Snodgrass, Upton, Upton, Baker & Griffis, and William A. Griffis, Jr., all of San Angelo, for appellant.

Ralph Logan, Dist. Atty., of San Angelo, for appellee.

McCLENDON, Chief Justice.

October 30, 1947, a Texas Ranger seized as contraband under Art. 636, Vernon's Ann. Penal Code, eight slot machines, one "Bally Entry Marble Machine," and an undetermined number of coins therein, situated in the clubhouse of the Club (San Angelo Country Club, Inc.). The same day

he filed this proceeding in the name of the State under Arts. 632–638, V.A.P.C., to have the seized property confiscated as a public nuisance. The Club was named owner, served with notice, and answered attacking the legality of the seizure, asserting ownership of the property, and seeking its return. In a trial to the court (a jury being denied the Club), the property was confiscated, and the Club has appealed.

The questions here involved are whether:

1. The Club was entitled to a jury trial;

2. The seizure, being without search warrant, was illegal, since there was (a) no violation of law committed in the presence of the seizing officer, and (b) no consent by the Club or anyone under its authority (so it contends) to search the premises;

3. The machines, at time of seizure, were being "kept or exhibited" as gaming devices.

As to the right of trial by jury the State contends that. Art. 637, Sec. 1, expressly provides for determination of the issues by the judge or magistrate before whom the proceeding is pending, thus excluding the right of jury trial; and that the constitutional right of trial by jury does not apply to civil actions for penalties not known to the common law; citing Texas Liquor Control Board v. Jones, Tex.Civ. App., 112 S.W.2d 227, and 50 C.J.S., Juries, § 20, p. 734. While not conceding these contentions, the Club contends that its answer seeking return of the property was tantamount to the independent suit authorized by Art. 638, the expression therein, "as in ordinary civil cases," including the right of jury trial. We find it unnecessary to decide these issues, for the reason that the trial court's judgment (as we hold below) is supported by conclusive evidence, and denial of a jury trial was harmless error, if error at all. 24 Tex.Jur., p. 589, § 26, and authorities cited in Note 3.

The proper answer to question 2 depends upon the effect of the evidence regarding the issue whether entry upon and inspection of the premises by the ranger was with consent of the custodian; no search warrant having issued. The facts upon this issue are without dispute. Substantially stated they are: The premises were owned by the Club and consisted of a clubhouse located upon grounds including a golf course, all enclosed in a wire fence with a single entrance, at which was a sign, "For Members Only." The clubhouse contained a number of rooms for recreation, entertainment, etc., including a game or concession room, in which the machines were kept. This room also contained a bar. The "pro-manager" of the Club was general custodian, carried the keys to the various rooms of the clubhouse; and generally supervised the Club and its employees. He and his family lived in the building, but in rooms provided for that purpose and separate from the club rooms, which were open at stated hours (usually from 11 a. m. until 8 or 10 p. m. on week days and until 12 at night on Sundays) and available to club members (about 250) and their guests, including their families on "family nights" held weekly. Members were permitted to use the club rooms for private entertainment under prescribed regulations, at which times the game room was closed to their guests and open only to members. About 9:55 a. m. of the day of the seizure the ranger and a patrolman came to the entrance gate and parked their car. The custodian's version is contained in the following quotation from his testimony:

"At approximately 10 minutes to 10:00 I went out the door to give the lessons and I saw this car parked there and thought it was peace officers, so I went and asked them if there was anything I could do to help them, whatever they wanted to do, and he said, 'Is this place open?' I said, 'It is not open.' He said, 'You came out of it, didn't you?' He said, 'How come it is not open?' And I said, 'I live there.' I said, 'I live there, but the concessions of the Country Club are not open,' and he said, 'Do you have a key to it?' I said, 'Yes.' He said, 'I would like to get in and look around.' As far as asking for a search warrant—Q. Was anything said about a search warrant? I didn't ask you that. A. I was giving my thought on it. I took him in the front door. I said, 'Well, I can let you in this concession room, I can go around the back and let you in.' Q. Pardon me. Had he mentioned anything about the slot machines up to that time?

A. Not until he got in the building. I let him in the room and he said, 'These are slot machines.' I said, 'Of course.' But he made the statement the other three or four machines were not locked, but the nickel and dime machines were the only ones not locked and if he will remember he had me to go get the keys and unlock the cases. But he said he was going to tag these machines. I said, 'I don't want to have all this fun by myself,' and looked in the phone book to look up Mr. Rust's number. I said, 'All I want is to call his number, all I am is just a working man here;' and he said, 'I don't want you to because they are making the raid all at one time. After that you can call.' Then after that he wanted to know if I had a key to get in the machines. I told him yes. I went upstairs where I kept the keys locked up and unlocked the machines so he could look at them. After a certain period of time, I would say 10 or 20 minutes—well, back to the point he said it was 20 minutes or so before calling the truck. I asked to call who owned the machines as soon as we got inside the room. After he saw the slot machines he told Patrolman Rice to call the transfer company to come for the machines. Q. You weren't permitted to do any telephoning until after that? A. Yes, sir."

■ The pertinent principles of law are thus epitomized, with abundant citation of authority, in 38 Tex.Jur., p. 77, § 53:

"While the people are entitled to security from unreasonable searches and seizures, an accused person may give his consent to a search and thereby waive irregularities in the search warrant or dispense altogether with the necessity for a warrant. In other words, one who consents to a search of his property or effects waives the right to oppose proof of the result of the search upon the ground that it was unauthorized. In this connection it may be observed that even where the officer was given permission to enter a private home merely for a drink of water or similar purpose, his removal of articles found therein and tending to connect its owner with a criminal offense was not unlawful, he having not been a trespasser."

■ The application of these principles to the above testimony of the custodian, which is without substantial controversy, is obvious. The ranger and accompanying patrolman were not trespassers in any sense of the word. Their entrance into the building was not only with the consent, but upon invitation of the custodian. His unlocking the game room and showing the machines was purely voluntary. The evidence presents no issue of duress, intimidation or fraud.

■■ The evidence is conclusive that the machines were per se gaming devices, and, although not then in use or on exhibition for gaming purposes, were then being "kept" for those purposes, within the meaning of Art. 625, V.A.P.C. Both the slot and marble machines were designed for gambling, with automatic pay-off devices, and locked coin receptacle compartments. They had been installed at a cost of some $3,500, were "robbed" every two weeks by the president, and yielded to the Club a revenue of approximately $1,200 per month. They were constantly in use or on display for use by members of the Club and their guests, during the hours each day (stated above) when the game room was kept open.

"It is not essential that it be shown that such devices were actually in use at the time of seizure to bring them under condemnation of the law, if it be shown, directly or otherwise, that they were exhibited or displayed for the purpose of gaming." Callision v. State, Tex.Civ.App. 146 S.W.2d 468, 469.

The trial court's judgment is affirmed.

Affirmed.